IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| SCOTT GRAY | § | |
| | § | |
| V. | § | ACTION NO. 4:09-CV-225-Y |
| | § | |
| FORT WORTH INDEPENDENT | § | |
| SCHOOL DISTRICT and HERB | § | |
| STEPHENS | § | |

## ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT, OVERRULING DEFENDANTS' OBJECTIONS, AND SUSTAINING IN PART PLAINTIFF'S OBJECTIONS

Pending before the Court are Defendants' Motions for Summary Judgment (docs. 27 & 28), filed September 20, 2010; Plaintiff's Objections to Defendants' Joint Appendix (doc. 36), filed October 29, 2010; and Defendants' Objections to Plaintiff's Responses and Appendix (doc. 44), filed November 30, 2010. The Court GRANTS the motions for summary judgment, OVERRULES Defendants' objections, and PARTIALLY SUSTAINS Plaintiff's objections.

### I. BACKGROUND

#### A. SEXUAL HARASSMENT

In 1994, plaintiff Scott Gray took a job with defendant Fort Worth Independent School District ("FWISD") at Southwest High School ("Southwest") as an assistant basketball coach and health teacher. (Defs.' J.A. 8.) In 1996, Gray was promoted to head basketball coach at Southwest, but he continued to teach health classes as well. On June 27, 1997, Gray signed a continuing employment contract with FWISD as a certified classroom teacher.[1] The contract provided that

---

[1] There is no explanation why Gray's continuing employment contract was not signed until three years after he started his employment with FWISD. The Court assumes Gray was on some sort of probationary status for his first few years of employment. (Defs.' J.A. 21.) But because the parties do not raise this as a summary-judgment issue, the Court will ignore it as well.

Gray was subject to reassignment or transfer at any time during his contract: "The Teacher shall be subject to assignment and reassignment of positions or duties, additional duties, changes in responsibilities or work, transfers, or reclassification at any time during the life of this contract." (Defs.' J.A. 255.)

During the 2006-2007 and 2007-2008 school years, Angela Nelson was the assistant principal at Southwest and Gray's immediate supervisor. In September or October of 2006, Nelson called Gray and asked him to spend the night with her, but Gray refused. (Defs.' J.A. 13.) Nelson later offered oral sex to Gray, which was also refused. (Defs.' J.A. 13.) On November 14, after Gray heard that Nelson planned to give Gray a bad evaluation, Gray complained to Laura Williams, the principal of Southwest, about the sexual harassment. (Defs.' J.A. 20-22; Pl.'s App. 6.) Williams ensured that Nelson's May 4, 2007, evaluation of Gray reflected well on Gray. (Defs.' J.A. 22, 48, 52.) Shortly before the evaluation, Nelson sent Gray a letter telling Gray that it was "unacceptable" that Gray was continuously late to his first period class. (Pl.'s App. 212.)

Nelson and Gray stated they began to avoid one another. (Pl.'s App. 10, 162.) But in October 2007 Nelson allegedly berated Gray in front of students two separate times. (Pl.'s App. 11-12.) Gray complained to Williams about Nelson's subsequent, non-sexual harassment "three or four times," but "Williams seemed to retaliate by assigning me . . . a different lunch period, assigning me another health class, teaching more classes than any coach in the city, having a seventh period class." (Defs.' J.A. 20.) In November, Gray called FWISD's Office of Professional Standards ("OPS") and reported that he "had been sexually harassed by principal." (Pl.'s App. 213.) Although OPS asked Gray to come in for an interview, Gray did not pursue the complaint. (Defs.' J.A. 453.)

2

## B. GAME EJECTION AND HEARING

On December 1, 2007, Gray was ejected from a basketball game he was coaching after he received two technical fouls for being his "normal animated self" to the referees. (Defs.' J.A. 293.) "Some days later," Herb Stephens, FWISD's athletic director; Kevin Greene, FWISD's assistant athletic director; and Williams met with Gray about the ejection. (Defs.' J.A. 429; Pl.'s App. 29.) Gray received an oral reprimand as a result of the meeting; however, Gray believed that he had not been reprimanded at all. (Pl.'s App. 29, 232; Defs.' J.A. 433-34, 457.) On January 9, 2008, Gray was required to attend a hearing before the University Interscholastic League ("the UIL"). (Defs.' J.A. 179, 181.) Stephens forwarded the game tape with the ejection to the UIL, but did not attend the hearing. (Pl.'s App. 29-30, 79.) After the hearing, the UIL gave Gray the minimum punishment: a public reprimand with one year's probation. (Defs.' J.A. 185.) Gray believed the hearing and punishment were "fair and right." (Defs.' J.A. 36.)

## C. ENVIRONMENT AT SOUTHWEST

On January 31, Williams sent Gray a note telling him that his first period class had been unattended for ten minutes that morning and that he was required to be on time. (Pl.'s App. 217.) Gray responded that the lateness was caused by his toothache that day and he further complained of his heavy class load and a "hostile work environment," including "mental[]" pressure caused by Nelson. (Pl.'s App. 218-19.) On February 7, Gray forwarded his January 31 response letter to Walter Dansby, the FWISD deputy superintendent with responsibility for the athletic department, so Dansby could "better understand my hostile work environment" caused by Nelson's harassment. (Pl.'s App. 220.) Also in February, Gray told a reporter that he would not return as the boys' basketball couch at Southwest for the 2009 season. He specifically said he was not retiring, but that

3

he was ready to "move on." (Defs.' J.A. 816.)

## D. STATE CHAMPIONSHIP AND SUSPENSION

On March 8, Gray's basketball team played for the state championship, but lost the game. (Defs.' J.A. 60.) When he was leaving the court, Gray told Charles Breithaupt, the executive director of the UIL, that the referees "were horrible." (Defs.' J.A. 62.) Because he was ill, Gray did not return to the court to receive the team's trophy. (Defs.' J.A. 458.) Gray did appear for the official press conference and criticized the officiating crew. (Defs.' J.A. 430.) Greene left the room "so as not to appear to support Mr. Gray's statement critical of the officiating crew," but the UIL's media coordinator ended the press conference. (Defs.' J. A. 138, 430.) Gray then talked to reporters in the hallway outside the press room and again criticized the referees for not being able to officiate effectively a "fast-paced game":

> What disappoints me most is that, for a fast-paced game, us and South Oak Cliff, that . . . I wish they would have officials from cities, like Houston, Dallas . . ., San Antonio, that are used to calling fast-paced games, instead of officials from like Amarillo. . . . I just wish they would have got fast-paced officials that are used to calling that fast-paced of a game. . . . I blame more the UIL than I do the officials.
>
> . . . .
>
> . . . They're all slow down out in West Texas. And the guy that even they had down — the referee from Amarillo, [a coach from Amarillo] said [the referee] is on his scratch list because he can't call a fast-paced game.

(Defs.' J.A. 41, 230, 379.)

On March 10, Breithaupt called Stephens to apprise him of Gray's comments about the officials and that Gray could be subject to further penalties from the UIL. (Defs.' J.A. 117.) Specifically, the UIL believed Gray had violated the Athletic Code, which provided that school district personnel must "[a]ccept decisions of sports . . . officials without protest, and without

4

questioning their honesty or integrity, and extend protection and courtesy to sports officials . . . remembering that officials are guests." (Defs.' J.A. 474.) On March 12, the UIL sent Stephens a letter asking that he "investigate the allegations and send a copy of your findings to our office and to your district-executive committee, along with what disciplinary or corrective action was taken, if any." (Pl.'s App. 268.) Stephens did not comply. (Defs.' J.A. 461-62.) On March 28, the UIL sent a letter to FWISD Superintendent Melody Johnson, Dansby, Williams, Stephens, and Gray that a hearing regarding Gray's post-game comments was set for April 4. The letter stated that they were "asked to attend and/or send appropriate representatives of your district to give testimony and answer questions of the committee." (Pl.'s App. 221.) When asked if someone other than Gray was required to attend the hearing, the chairman of the UIL's executive committee stated that "[w]e do ask that they be in attendance. We want them in attendance." (Defs.' J.A. 83.) If school representatives attend, they are expected to answer questions.

To prepare for the hearing, Dansby and Stephens met with Gray and explained what rule the UIL was concerned Gray had violated. (Defs.' J.A. 40.) Dansby told Gray to listen to the executive committee and only answer the questions asked. (Defs.' J.A. 42.) Apparently, this advice was warranted because Gray admits he is "brash" and "can get under people's skin." (Defs.' J.A. 42.) Dansby did not read or discuss the specific rule with Gray, but raised Gray's criticism of the officials and how Gray should respond at the hearing. (Pl.'s App. 77.) As a result of the meeting, however, Gray admits he understood the rule before he went to the hearing. (Defs.' J.A. 40.) Stephens later discussed the upcoming hearing with Breithaupt and believed he would not be called to testify if he attended; thus, he did not prepare for the hearing.[2] (Defs.' J.A. 459; Pl.'s App. 60-61.)

---

[2]Indeed, when Stephens signed a hearing-attendance card, he indicated that he did not intend to testify. (Defs.' J.A. 199.)

Stephens, Greene, Dansby, Williams, and Gray attended the April 4 hearing. (Defs.' J.A. 199-200.) Stephens was called to testify, and the committee asked what action he had taken regarding Gray's comments after the championship game and after the December 2007 ejection. Stephens stated that no action had been taken regarding the post-game comments, but mistakenly stated that Gray had received a written reprimand after the ejection. (Defs.' J.A. 196, 460.) Stephens also referred to Gray's "personnel issues," by which he meant Gray's assertions that he was not returning to Southwest and Gray's verbal abuse of co-workers. (Defs.' J.A. 460.) Gray admits that when he testified, he did not heed Dansby and Stephens's previous advice (Defs.' J.A. 42):

> Gray . . . said that he did not understand his statements violated the UIL *Constitution and Contest Rules*. He didn't know anything about the problem until Friday when Ms. Williams came to his classroom to let him know that he would be appearing before the State Executive Committee. He later found out that his comments quoted in papers across the state were the reason he was appearing. He quoted his words from the press conference about the official and explained that i[t] was just an analogy. He only repeated the information because he was asked to explain himself. Athletic Director Herb Stephens discussed the article from the paper with him on Friday.

(Defs.' J.A. 196.) Gray felt "attacked" and spoke up to "defend" himself. (Defs.' J.A. 42-43.) The chairman of the committee stated that Gray was "defiant" and refused to admit he had done anything wrong. (Defs.' J.A. 78.) The committee suspended Gray "from all UIL activities for the 2008-2009 school year," i.e., Gray could not coach extracurricular sports during the upcoming school year. (Defs.' J.A. 196.) Gray asserted that the UIL had predetermined his punishment before the hearing. (Defs.' J.A. 36-37; Pl.'s App. 33.)

6

### E. OPS COMPLAINT, UIL APPEAL, AND REASSIGNMENT

Three days later on April 7, Gray filed a complaint with OPS regarding Nelson's sexual harassment in late 2006. (Defs.' J.A. 336.) Gray's allegations against Nelson were substantiated, and Nelson was given a verbal warning by Williams. (Defs.' J.A. 453.) On April 25, Williams gave Gray a good employment evaluation. (Pl.'s App. 131.) On April 29, Greene sent Gray a letter memorializing the previous verbal warning Gray had received regarding the 2007 game ejection. (Pl.'s App. 232.) Additionally, Stephens called Breithaupt and told him Gray's warning in 2007 had been verbal and not written. Breithaupt told Stephens that the type of warning FWISD had given Gray regarding the 2007 game ejection had not affected the committee's decision to suspend Gray for his post-game comments in 2008. (Defs.' J.A. 462.)

On May 22, Breithaupt, Gray, Stephens, Greene, and the UIL assistant athletic director conferred regarding Gray's suspension. Breithaupt told Gray that the suspension was "surprising," but that if Gray showed some remorse for his actions in an appeal to the UIL, the penalty could be reduced. (Defs.' J.A. 390-92.) Breithaupt emphasized that he believed Gray's unrepentant demeanor at the hearing was the determining factor for the committee's decision. (Defs.' J.A. 393.) On June 5, Gray sent an appeal letter to Breithaupt admitting his comments about the referees were "unprofessional" and showed "poor judgment." (Defs.' J.A. 396.) Breithaupt forwarded the letter to the chairman of the executive committee, who determined that Gray's appeal should be denied. (Pl.'s App. 100.) Gray did not pursue the available judicial remedies regarding the appeal denial or file a grievance with FWISD. (Defs.' J.A. 438.)

On August 1, Gray sent a letter to Johnson complaining of sexual harassment by "an administrator creating a hostile work environment for the last year and a half," retaliation by "an

administrator," and perjury by "an administrator" at the April 4 UIL hearing. He further complained about conflicting information he was given about his future as a basketball coach at Southwest:

> I have been given conflicting information regarding my status as the Head Basketball Coach at Southwest . . . for the 2009-2010 school year. The Athletic Department has informed me that after serving my one year UIL suspension I am the Head Basketball Coach of Southwest . . . for the 2009-2010 season. Secondary Operations has implied that I am not the coach in 2009-2010.

(Pl.'s App. 239.) Indeed, Stephens believed that an interim coach would be in place for the 2008-2009 school year and that Gray would return to coach for the 2009-2010 school year. (Pl.'s App. 53.) But on August 16, Gray received an e-mail from FWISD's human-resources department that he had been assigned to be an "extra help PE teacher" at an elementary school. (Pl.'s App. 264.) Two days later, Carla Kaufman, an assistant superintendent with FWISD's human-resources department, completed a "Position/Personnel Authorization Form," which stated Gray was assigned to the "pool due to OPS issue,"[3] which formally vacated his position at Southwest, but allowed Gray to continue to receive his salary, including his coaching stipend, for the 2008-2009 school year. (Pl.'s App. 89, 241-42.)

On September 23, Kaufman responded to Gray's August 1 letter:

> Regarding the UIL suspension, [FWISD] cannot overturn that ruling. As long as your suspension is in place, you cannot coach. Regarding your assignment for 2009-2010, I would refer you to your employment contract which states that *"The Teacher shall be subject to assignment and reassignment of positions or duties, additional duties, changes in responsibilities or work, transfers, or reclassification at any time during the life of this contract."* At this time, I do not know where you will be assigned in 2009-2010 or if it will involve coaching duties. That decision will be made at a later date according to the needs of [FWISD] at that time.
>
> Your allegations of sexual harassment, retaliation, and hostile working environment will be

---

[3]A "pool" is a group of teachers under contract with FWISD but who do not have teaching assignments at specific campuses. (Defs.' J.A. 446.) Apparently, these teachers would be assigned to substitute when needed until they received a more permanent assignment.

investigated in accordance with Board Policy and law. I have forwarded these complaints to Rufino Mendoza, the Title IX Coordinator. Mr. Mendoza . . . will request [the OPS] to investigate your allegations. You can expect a call from [the OPS] to initiate the investigation. Please lend your cooperation to that department so that the investigation can proceed promptly.

(Pl.'s App. 240.) The record is unclear what action was taken on Gray's complaints after this letter, but it is clear that Gray never filed a subsequent, internal grievance with FWISD about any of the complaints raised in his 2008 letter to Johnson. (Defs.' J.A. 438-39.)

### F. THE EEOC AND THE INSTANT SUIT

On November 24, Gray filed a charge of discrimination with the Equal Employment Opportunity Commission ("the EEOC") raising sex discrimination and retaliation. The investigator noted that his retaliation claim was tenuous because of the time gap between the report and the alleged retaliation:

> [Gray] indicated that on November 14, 2006, he made an internal complaint regarding . . . Nelson making sexual comments and requesting sexual advances. . . . Investigator . . . asked [Gray] what harm he experienced since his internal complaint. He responded none. However, [Gray's] Attorney indicated that in October 2007, [Gray] was harassed in front of his students by Ms. Nelson. Asked [Gray] if he was still with the School District. He responded yes, but that he was reassigned to a job pool, Substitute Teacher position effective July 2, 2008[,] and he believes it is in retaliation for having reported the sexual harassment and because of his sex.
>
> Investigator . . . informed them both that I will take his charge, but that I am having a hard time connecting retaliation from reporting the sexual harassment in 2006 and his reassign[ment] on July 2, 2008.

(Defs.' J.A. 149, 151, 161.) Gray did not check the box to indicate that Nelson's harassment in November 2006 was a continuing violation, but he did state in the detailed inquiry that "Nelson's harassment of me continued" after he reported it to Williams in 2006. (Defs.' J.A. 152, 166.) On January 21, 2009, the EEOC issued a right-to-sue letter and stated that it was "unable to conclude that the information obtained establishes violations of the statutes." (Defs.' J.A. 146.)

9

On March 27, Gray filed suit against FWISD for violating his due-process rights under § 1983 by failing to prepare him fully for the UIL hearing and for giving false information at the hearing. (Notice of Removal Attach. 6 at p. 4; Resp. 15.) *See* 42 U.S.C. § 1983. Gray additionally asserted that FWISD retaliated against him in violation of the Texas Commission on Human Rights Act ("the TCHRA") by "its conduct before the UIL" and by transferring Gray to the substitute pool. (Notice of Removal Attach. 6 at p. 5.) *See* Tex. Lab. Code Ann. § 21.055 (West 2006). Gray also raised a defamation claim against Stephens for false statements he made at the 2008 UIL hearing. (Notice of Removal Attach. 6 at p. 5.) Both FWISD and Stephens assert they are entitled to judgment as a matter of law. Gray resigned from FWISD on June 2, 2010.

## II. SUMMARY-JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate when the movant establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is considered genuine if it is real and substantial as opposed to merely formal or a sham. *See Brazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001). A material fact is one that could affect the outcome of the suit under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To show that a particular fact is or cannot be genuinely in dispute, a party must support the assertion either by (1) citing to particular parts of materials in the record, such as depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials, (2) showing that the materials cited do not establish the absence or presence of a genuine dispute, or (3) showing that the adverse party cannot produce

admissible evidence to support the fact. *See* Fed. R. Civ. P. 56(c)(1). The Court only is required to consider the materials cited by the parties, but may consider other materials in the record. *See id.* 56(c)(3). The Court views the considered materials in the light most favorable to the nonmovant, drawing all reasonable inferences in the nonmovant's favor. *See Sanders-Burns v. City of Plano*, 594 F.3d 366, 380 (5th Cir. 2010). But if the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50.

## III. DISCUSSION

### A. DUE-PROCESS CLAIMS—FWISD

To prevail on his due-process claims, Gray must show that the moving force behind the violation of his due-process rights was an official policy, custom, or practice enacted by a policymaker of FWISD. *See Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003). The policymaker must have final policymaking authority. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). In other words, the disputed conduct must be directly attributable to the defendant through some sort of official action or imprimatur; thus, isolated actions by employees will rarely trigger liability. *See Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

Under Texas law, the final policymaker of a school district is the district's board of trustees. *See Jett v. Dallas Indep. Sch. Dist.*, 7 F.3d 1241, 1245 (5th Cir. 2003). Gray has proffered no evidence to suggest that an official policy, custom, or practice enacted by FWISD's board of trustees was the moving force behind the allegedly inadequate preparation Gray received in anticipation of his 2008 hearing. Indeed, Gray does not assert that he received inadequate preparation for his 2007 hearing, which mitigates against his arguments that it was "the practice of the athletic department"

11

to "fail to prepare employees for a UIL inquiry." (Resp. 15.) Likewise, there is no evidence that there was a policy, custom, or practice approved by the board of trustees showing that it was "the practice of the athletic department to fail to investigate UIL inquiries." (Resp. 15.) Gray admits as much by conceding that he does "not . . . know the scope of this practice." (Resp. 15.) Even though there is some evidence that Stephens did not adequately prepare for the 2008 UIL hearing, this is no more than an isolated incident by an employee that cannot rise to the level of a custom or policy required for due-process violations. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992). Accordingly, FWISD is entitled to summary judgment on Gray's due-process claims.[4]

### B. RETALIATION CLAIM—FWISD

Gray asserts FWISD retaliated against him for "his complaints of sexual harassment" in 2006 and 2008 as shown by FWISD's "conduct before the UIL and in later placing Gray in the substitute teacher pool." (Notice of Removal Attach. 6 at p. 5.)

#### 1. Exhaustion

FWISD asserts that Gray failed to properly exhaust his retaliation claim before the EEOC, which is a condition precedent[5] to bringing a judicial claim of employment discrimination. *See*

---

[4] Additionally, Gray makes no argument that FWISD had a constitutional duty to prepare him for the UIL hearing. *See Griffith v. Johnston*, 899 F.2d 1427, 1435 (5th Cir. 1990) (stating plaintiff has burden to show violation of recognized interest falling under due-process clause). Indeed, the Court can find no authority for such a duty. In the absence of such a constitutional duty, there can be no due-process violation. *See, e.g., Walton v. Alexander*, 44 F.3d 1297, 1301-02 (5th Cir. 1995); *Caine v. Hardy*, 943 F.2d 1406, 1413 (5th Cir. 1991).

[5] Although some courts have held that sufficient administrative exhaustion is a jurisdictional prerequisite, the United States District Court for the Northern District of Texas recently has held that it is a condition precedent and not jurisdictional. *See Buyze v. Mukasey*, No. 3:07-CV-1191-M, 2008 WL 904718, at *3 (N.D. Tex. Mar. 31, 2008) (Lynn, J.); *Dixon v. Moore Wallace, Inc.*, No. 3:04-CV-1532-D, 2006 WL 1949501, at *7 n.12 (N.D. Tex. July 13, 2006) (Fitzwater, J.), *aff'd*, 236 Fed. Appx. 936 (5th Cir. 2007); *accord Hoffman-LaRoche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 446 (Tex. 2004).

*McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 273 (5th Cir. 2008). Specifically, FWISD asserts that Gray did not exhaust any claims based on any alleged protected activities other than his complaint to Williams in 2006. (FWISD Summ. J. Br. 33-34.) But a judicial claim is considered exhausted to the extent of the scope of the investigation of the administrative charge and what could reasonably be expected to grow out of such an investigation. *See Pacheco v. Mineta*, 448 F.3d 783, 789 n.9 (5th Cir. 2006). In other words, neither the verbatim allegations of the administrative charge nor the scope of the investigation determines the limits of a plaintiff's civil complaint. *See Clark v. Kraft Foods, Inc.*, 18 F.3d 1278, 1280 (5th Cir. 1994).

In his charge detail inquiry, Gray alleges that Nelson's harassment continued after the 2006 report to Williams: "Nelson belittled me in front of students, daily harrassed [sic] me, and my schedule was changed. Eventually, the district re-assigned me." (Defs.' J.A. 166.) Gray exhausted his retaliation claim premised on his reassignment to the substitute pool. The scope of the EEOC investigation would have or should have included Nelson's and Gray's post-2006 actions. The investigator's intake comments do not foreclose the fact that the investigation should have included Nelson's continuing conduct and Gray's 2008 OPS complaint.

But Gray's assertions that he was retaliated against as shown by FWISD's conduct at his 2008 UIL hearing is not exhausted. Gray wholly failed to mention the UIL hearings or that they were affected in any way by his prior reports of Nelson's conduct. Likewise, Gray did not refer to the 2008 UIL hearing in his OPS complaint. Although Gray raised the 2008 UIL hearing in his August 2008 letter to Johnson, this letter never resulted in a formal complaint filed in accordance with FWISD's internal grievance procedures. Accordingly, the scope of the EEOC's retaliation investigation would not have included any conduct by the FWISD at the 2008 UIL hearing. Thus,

Gray failed to assert the facts that form the basis for this portion of his legal claim of retaliation, and this portion of Gray's retaliation claim must be dismissed for failure to exhaust.[6] *See James v. Kindercare Learning Ctrs., Inc.*, No. 3:03-CV-1583-H, 2004 WL 1773700, at *4 (N.D. Tex. Aug. 9, 2004) (Sanders, Senior J.).

2. Prima-Facie Case of Retaliation and Burden-Shifting Framework

The question now becomes whether Gray has established a prima-facie case of retaliation by asserting his reassignment to the substitute pool. Under the TCHRA,[7] a prima-facie case of retaliation requires evidence that (1) the employee engaged in a protected activity, (2) the employer took an adverse employment action, and (3) there was a causal connection between participation in the protected activity and the adverse employment action. *See Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 331 (5th Cir. 2009); *Ameen v. Merck & Co.*, 226 Fed. Appx. 363, 376 (5th Cir. 2007). If the plaintiff establishes a prima-facie case of retaliation, the burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for its actions. *See McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). If the employer meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact either (1) that the employer's reason is not true, but is a pretext for retaliation, or (2) that the employer's reason, while true, is only one of the reasons for its conduct and another motivating factor was the plaintiff's protected activity. *See Smith v. Xerox Corp.*, 602 F.3d 320, 326-27 (5th Cir. 2010); *Rachid v. Jack in the Box, Inc.*, 376

---

[6]Additionally, this claim would fail on summary judgment because FWISD's actions or inactions at the 2008 UIL hearing do not constitute an adverse employment action. (FWISD Summ. J. Br. 39-40.) Further, Gray's assertion that the UIL had predetermined his punishment before the 2008 hearing renders his retaliation claim regarding FWISD's conduct before and during the UIL hearing nonsensical.

[7]Although Gray specifically brought his retaliation claim under the TCHRA, the Court may look to federal law interpreting Title VII when analyzing TCHRA claims because the TCHRA was designed to align Texas state law with federal law. *See Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex. 2001).

F.3d 305, 312 (5th Cir. 2004).

Gray has met the first prima-facie prong by engaging in a protected activity: reporting Nelson's harassment to the appropriate FWISD authorities. Regarding the second prima-facie prong, FWISD asserts that reassigning Gray was not an adverse employment action because it was entitled to transfer and reassign Gray under Gray's employment contract and because the reassignment was necessitated by the administrative action taken by the UIL and not by any FWISD decision. (Defs.' J.A. 255; FWISD Summ. J. Br. 44; FWISD Reply 9.) An adverse employment action does not include decisions made by an employer that merely limit an employee's opportunities for promotion but do not affect his job duties, compensation, or benefits. *See Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003). Here, however, Gray's reassignment to the substitute pool resulted in his eventually losing his coaching stipend for the 2009-2010 school year and an obvious change in his job's duties. (Pl.'s App. 31.) FWISD asserts that the employment actions, even if considered adverse, were taken by the UIL and not FWISD. But FWISD cites no law in support of its position that the UIL's suspension rendered FWISD's transfer and reassignment of Gray effectively a UIL decision that cannot be imputed to FWISD.[8] Indeed, the evidence clearly shows that FWISD employees decided to remove Gray from Southwest and place him in the substitute pool. (Pl.'s App. 134; Defs.' J.A. 445.)

A determination of a causal link between protected activity and an adverse employment action, the third prima-facie prong, is difficult and fact specific. *See Smith*, 371 Fed. Appx. at 520. Gray may establish the required causal connection by providing either direct evidence of a retaliatory motive on the part of FWISD or circumstantial evidence that creates a rebuttable

---

[8]In fact, Williams testified that the UIL had nothing to do with the change in Gray's teaching duties. (Pl.'s App. 129.)

15

presumption of a retaliatory motive. *See Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 414-15 (5th Cir. 2003). Some indicia of causation are: (1) the employee's past disciplinary record, (2) whether the employer followed its typical policy and procedures in reassigning the employee, and (3) the temporal proximity between the employee's conduct and the adverse employment action. *See Smith*, 371 Fed. Appx. at 520.

Gray is relying on circumstantial evidence to establish the causal link between his reassignment and his administrative complaints about Nelson's harassment. First, Gray's 2006 complaint is too remote in time to Gray's reassignment in August 2008 to provide a causative connection. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001); *See Campbell v. England*, 234 Fed. Appx. 183, 187-88 (5th Cir. 2007). Gray's April 7 OPS complaint and August 1 letter to Johnson, however, are close enough to Gray's August reassignment to provide an indicium of causation--though temporal proximity alone is not sufficient evidence to establish the third prong of a plaintiff's prima-facie case. *See Swanson v. Gen'l Servs. Admin.*, 110 F.3d 1180, 1188 n.3 (5th Cir. 1997).

To establish a causal connection, a plaintiff arguing retaliation must show the decision-maker was aware of the protected activity. *See Manning v. Chevron Chem. Co.*, 332 F.3d 874, 883 (5th Cir. 2003). The decision to reassign Gray out of Southwest was made by Williams and Charles Boyd, an assistant superintendent. (Defs.' J.A. 445; Pl.'s App. 133.) There is no evidence that Boyd was aware of Gray's harassment complaints. Williams was aware of Gray's OPS complaint, but there is no evidence she was aware of Gray's August 1 letter to Johnson. Regarding the OPS complaint, Williams states that she made the reassignment decision based on Gray's inability to coach and Southwest's staffing needs:

> I decided, working in conjunction with Assistant Superintendent Charles Boyd, to ask that Mr. Gray be transferred out of Southwest . . . in order to make room for the new teacher/coach. There was no other teaching position Mr. Gray could have been placed in at Southwest . . . .
>
> . . . My decision to transfer Mr. Gray out of Southwest was not made for any reason other than to accommodate staffing needs, in light of Gray's inability to coach for one year. Moreover, Mr. Gray had made numerous statements concerning his intent not to return to Southwest . . . the following school year. I did not think that Mr. Gray was interested in staying at Southwest . . . .

(Defs.' J.A. 445.) Gray's subjective belief that he was reassigned by Williams and Boyd based on his harassment complaints is insufficient to provide an indicium of causation. *See Bartosh v. Sam Houston State Univ.*, 259 S.W.3d 317, 329-30 (Tex. App.—Texarkana 2008, pet. denied). Finally, although the August 18 authorization form stated that Gray was reassigned "due to OPS issue," the form was not produced by Williams or Boyd and, thus, cannot be a causative link. Gray has failed to raise a material fact issue regarding the causative connection between his harassment complaints and his reassignment. Accordingly, Gray has failed to establish a prima-facie case of retaliation that survives FWISD's summary-judgment motion.[9]

### C. DEFAMATION—STEPHENS

Gray alleges Stephens slandered him at the 2008 UIL hearing because Stephens's statements "were false and injured Gray in his occupation." He further argues that Stephens's statements were part of "a personal vendetta against Gray outside of any representative capacity on behalf of [FWISD]." (Notice of Removal Attach. 6 at p. 5.) A suit against a professional employee[10] of a

---

[9]Even if Gray had established a prima-facie case, he has failed sufficiently to raise a material fact issue either that FWISD's reason is false and a pretext for retaliation or that FWISD's reason, while true, is mixed with the motivating factor of Gray's harassment reports.

[10]A "professional employee" includes supervisors such as Stephens. *See* Tex. Educ. Code Ann. § 22.051(a)(1) (West 2006)

school district may not be filed unless the person has exhausted the administrative grievance remedies provided by the school district. *See* Tex. Educ. Code Ann. § 22.0514 (West 2006). But Gray specifically sued Stephens "outside of any representative capacity on behalf of [FWISD]." (Notice of Removal Attach. 6 at 5.) As such, Gray was not bringing suit against Stephens in his official capacity, but in his individual capacity, which removes Gray's claim from the administrative-exhaustion requirement. *See Johnson v. Tims*, No. 10-05-006-CV, 2005 WL 1531336, at *1 (Tex. App.—Waco June 29, 2005, pet. denied); *cf. Stephens v. Allen Indep. Sch. Dist. Bd. of Trustees*, No. 4:08-CV-058, 2009 WL 394324, at *2 (E.D. Tex. Feb. 13, 2009) (holding constitutional claims against school's professional employees not governed by statutory exhaustion requirement).

Stephens is, however, entitled to statutory immunity from Gray's claim. Texas law provides statutory immunity to professional employees of a school district for actions taken as part of their employment duties:

> A professional employee of a school district is not personally liable for any act that is incident to or within the scope of the duties of the employee's position of employment and that involves the exercise of judgment or discretion on the part of the employee, except in circumstances in which a professional employee uses excessive force in the discipline of students or negligence resulting in bodily injury to students.

Tex. Educ. Code Ann. § 22.0511 (Vernon Supp. 2010). Gray argues that Stephens made his statements outside the course and scope of his employment because he voluntarily chose to attend the hearing and because Stephens's statements involved no discretion or judgment. (Resp. 14.)

Although Stephens attended the hearing to "support" Gray, the UIL required Stephens to testify. (Pl.'s App. 68; Defs.' App. 83.) Further, Gray believed he "had to" attend because he was the athletic director and Gray's conduct occurred at a state tournament. (Defs.' J.A. 460.) The UIL

18

considered Stephens to be testifying in his official capacity. (Defs.' J.A. 83.) Although Stephens's attendance may have had a voluntary component to it, he was expected to attend and, once there, made to testify. This does not render his testimony under oath before the UIL to be outside of or not incident to his duties as FWISD's athletic director. Stephens gave his testimony in furtherance of FWISD business and pursuant to his job as athletic director. *See Jones v. Houston Indep. Sch. Dist.*, 979 F.2d 1004, 1009 (5th Cir. 1992); *Upshaw v. Alvin Indep. Sch. Dist.*, 31 F. Supp. 2d 553, 559 (S.D. Tex. 1999); *Kobza v. Kutac*, 109 S.W.3d 89, 92-93 (Tex. App.—Austin 2003, pet. denied). Further, Stephens's statements clearly involved the exercise of discretion and judgment, which is not negated by Stephens's admission that he was "winging it" at the 2008 hearing because he was not prepared to testify. *See Kobza*, 109 S.W.3d at 94-95; *see also Jones*, 979 F.2d at 1009. (Pl.'s App. 65.) Stephens is entitled to statutory immunity for the statements he made at the UIL hearing. *See, e.g., Anderson v. Blankenship*, 790 F. Supp. 695, 697 (E.D. Tex. 1992); *Kobza*, 109 S.W.3d at 95.

### D. EVIDENTIARY OBJECTIONS

Gray, Stephens, and FWISD object to portions of their opponent's summary-judgment evidence. The Court overrules FWISD and Stephens's objections because they are rendered moot by the Court's disposition of their motions for summary judgment. Gray, however, objects to FWISD and Stephens's inclusion of evidence of Gray's behavior after his reassignment to the teacher pool. (Defs.' J.A. 257-58, 352-70.) Gray's post-reassignment actions led to his alleged constructive termination on June 2, 2010. But, as Gray points out, Gray is not raising any claims directed to his resignation on June 2, 2010. The Court agrees with Gray that this evidence is not relevant to the dispute at issue and should not be considered. Indeed, the Court did not refer to this

19

evidence when deciding the motions for summary judgment. The remainder of Gray's objections are without merit and are overruled for the reasons stated in FWISD and Stephens's response. (Obj. Resp. 4-6, 8-18.)

## IV. CONCLUSION

Gray's due-process claims must be dismissed because there is no evidence that FWISD's actions regarding the 2008 UIL hearing are attributable to FWISD through some sort of official action or imprimatur. Gray's retaliation claim based on FWISD's failure to prepare him for the 2008 UIL hearing has not been properly exhausted. Gray's retaliation claim based on his harassment reports to his superiors also fails because there is no evidence of a causal connection between his complaints and his reassignment. Finally, Gray's defamation claim against Stephens must be dismissed because Stephens's statements were made as part of his duties as a professional employee of FWISD, which entitles him to statutory immunity from Gray's claims. Gray's objection to the inclusion of irrelevant and prejudicial evidence of his post-reassignment conduct is sustained. All other evidentiary objections are overruled.

SIGNED March 24, 2011.

_Terry R. Means_
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE